# EXHIBIT A

# Request For Rulemaking

**Rule set #:**

2025-14 ST

**Department:**
State

**Bureau:**
Elections & Campaign Finance

**Title of rule set:**
Use of Electronic Pollbook

**Rule number(s) or rule set range of numbers:**
168.41 – R 168.51

**Filing date:**
10/23/2025

**Effective date:**
10/23/2025

**Click on the link(s) below to download**

**Request for Rulemaking** PDF HTML

*Request for Rulemaking Approved on: 3/6/2025 8:07:21 AM*

**Draft Rule Language** Word

*Draft Rule Language Approved on: 5/27/2025 11:09:48 AM*

**Regulatory Impact Statement** PDF HTML

*Regulatory Impact Statement Received on: 4/28/2025 6:05:11 PM*

*Regulatory Impact Statement Approved on: 5/14/2025 2:56:33 PM*

**Notice of Public Hearing** PDF HTML

*Notice of Public Hearing Approved on: 5/27/2025 11:09:48 AM*

**ARS - Administrative Rulemaking System**

*Final Rule Strike Bold Approved on: 10/23/2025 10:51:56 AM*

**Final Rule Language** PDF HTML

*Final Rule Language Approved on: 10/23/2025 10:51:56 AM*

**Joint Committee on Administrative Rules Report** PDF HTML

*Joint Committee on Administrative Rules Report Approved on: 7/28/2025 9:22:39 AM*

**Joint Committee on Administrative Rules Package Comments** PDF HTML

*Joint Committee on Administrative Rules Package Comments Approved on: 7/28/2025 9:22:39 AM*

**Joint Committee on Administrative Rules Package Transcript** PDF HTML

*Joint Committee on Administrative Rules Package Transcript Approved on: 7/28/2025 9:22:39 AM*

**Joint Committee on Administrative Rules Report Affidavit** PDF HTML

*Joint Committee on Administrative Rules Package Affidavit Approved on: 7/28/2025 9:22:39 AM*

Copyright 2026 State of Michigan

Accessibility | Policies

**Michigan Office of Administrative Hearings and Rules**
**Administrative Rules Division (ARD)**
MOAHR-Rules@michigan.gov

## REQUEST FOR RULEMAKING (RFR)

1. **Department:**
   State
2. **Bureau:**
   Elections & Campaign Finance
3. **Promulgation type:**
   Full Process
4. **Title of proposed rule set:**
   Use of Electronic Pollbook
5. **Rule numbers or rule set range of numbers:**
   168.41 – R 168.51
6. **Estimated time frame:**
   6 months

   **Name of person filling out RFR:**
   Jenny McInerney

   **Email of person filling out RFR:**
   McInerneyJ1@michigan.gov

   **Phone number of person filling out RFR:**
   517-331-7825

   **Address of person filling out RFR:**
   430 W. Allegan, Lansing, MI 48918
7. **Describe the general purpose of these rules, including any problems the changes are intended to address.**
   The purpose of these rules is to clarify rules regarding the electronic pollbook, given technological advances, the introduction of early voting and the early voting pollbook, and the security benefits of real time connection with the Qualified Voter File.
8. **Please cite the specific promulgation authority for the rules (i.e., department director, commission, board, etc.).**
   MCL 168.31(1)(a) provides that the secretary of state shall "issue instructions and promulgate rules pursuant to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328, for the conduct of elections and registrations in accordance with the laws of this state."

   A. **Please list all applicable statutory references (MCLs, Executive Orders, etc.).**
      MCL 168.31.

   B. **Are the rules mandated by any applicable constitutional or statutory provision? If so, please explain.**
      MCL 168.31(1)(a) provides that the secretary of state shall "issue instructions and promulgate rules pursuant to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328, for the conduct of elections and registrations in accordance with the laws of this state." Because these rules pertain to the use of the electronic pollbook--a vital tool in conducting elections in Michigan--they fall under this section.
9. **Please describe the extent to which the rules conflict with or duplicate similar rules, compliance requirements, or other standards adopted at the state, regional, or federal level.**

The rules do not conflict with any similar rules, requirements, or standards. The proposed rules do not explicitly duplicate any similar rules, compliance requirements, or other standards but they do update the interpretation of the electronic pollbook download in MCL 168.668b of the Michigan Election Law to account for technological and security advances and the use of live connectivity for the early voting pollbook in 2024.

10. **Is the subject matter of the rules currently contained in any guideline, handbook, manual, instructional bulletin, form with instructions, or operational memoranda?**
    The early voting subject matter is in the Bureau publication Early Voting Electronic Poll Book (EV EPB) Manual.
11. **Are the rules listed on the department's annual regulatory plan as rules to be processed for the current year?**
    The rules are not listed on the department's 2024 annual regulatory plan.
12. **Will the proposed rules be promulgated under Section 44 of the administrative procedures act of 1969, 1969 PA 306, MCL 24.244, or under the full rulemaking process?**
    Full Process
13. **Please describe the extent to which the rules exceed similar regulations, compliance requirements, or other standards adopted at the state, regional, or federal level.**
    The rules do not exceed similar regulations, compliance requirements, or other standards adopted at the state, regional or federal level.
14. **Do the rules incorporate the recommendations received from the public regarding any complaints or comments regarding the rules? If yes, please explain.**
    Yes. Following the success of the EV EPB during the 3 elections for which it was used in 2024, the Bureau of Elections convened a Lean Process Improvement (LPI) workshop to identify successes, opportunities for improvement, and ways the Election Day EPB (ED EPB) could more closely align with the EV EPB. Prior to the LPI, a survey was sent to clerk staff and over 350 stakeholders responded. The LPI also included 13 expert participants who serve as clerks, deputy clerks, and clerk staff in cities and townships around Michigan. The recommendation of the LPI, supported overwhelmingly by survey responses, was that all EPBs have live connectivity like the EV EPB.
15. **If amending an existing rule set, please provide the date of the last evaluation of the rules and the degree, if any, to which technology, economic conditions, or other factors have changed the regulatory activity covered by the rules since the last evaluation.**
    The proposed rules do not amend existing rules.
16. **Are there any changes or developments since implementation that demonstrate there is no continued need for the rules, or any portion of the rules?**
    No, there are no changes or developments because the rules do not amend existing rules.
17. **Is there an applicable decision record (as defined in MCL 24.203(6) and required by MCL 24.239(2))? If so, please attach the decision record.**
    No

**Based on the information provided in this RFR, MOAHR concludes that there are sufficient policy and legal bases for approving the RFR. The RFR satisfies the requirements of the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328, and Executive Reorganization Order No. 2019-1, MCL 324.99923.**

DEPARTMENT OF STATE

BUREAU OF ELECTIONS

USE OF ELECTRONIC POLLBOOK

Filed with the secretary of state on

These rules become effective immediately after filing with the secretary of state unless adopted under section 33, 44, or 45a(9) of the administrative procedures act of 1969, 1969 PA 306, MCL 24.233, 24.244, or 24.245a. Rules adopted under these sections become effective 7 days after filing with the secretary of state.

(By authority conferred on the secretary of state by section 31 of the Michigan election law, 1954 PA 116, MCL 168.31)

R 168.41, R 168.42, R 168.43, R 168.44, R 168.45, R 168.46, R 168.47, and R 168.48 are added to the Michigan Administrative Code, as follows:

R 168.41 Definitions.

Rule 1. (1) As used in these rules:

(a) "Act" means the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992.

(b) "Approved form of transmission" means an encrypted or password protected, or both, flash drive or other electronic media used to store election files and transfer files between the electronic pollbook and qualified voter file, or another form of secure storage and transmission if approved by the bureau of elections.

(c) "Department" means the department of state.

(d) "Electronic pollbook" means computer software that receives information from the qualified voter file and is used during elections to process voters and generate reports. Electronic pollbook includes, but is not limited to, the early voting electronic pollbook, the election day vote center electronic pollbook, and the election day electronic pollbook, or any combination of those electronic pollbooks.

(e) "Secretary of state's duly authorized agent" includes bureau of elections staff, other necessary department staff, county, city, and township clerks or their designees, election inspectors, and relevant department of technology, management, and budget staff as determined by the director of elections.

(2) Unless otherwise defined in these rules, a term defined in the act has the same meaning when used in these rules.

R 168.42 Access to electronic pollbook data and software.

Rule 2. (1) The voter data contained in the electronic pollbook are public records subject to the freedom of information act, 1976 PA 442, MCL 15.231 to 15.246. Voter data that is exempt from disclosure under section 13 of the freedom of information act, 1976 PA 442, MCL 15.243, must not be released.

(2) Records regarding electronic pollbook software programming are confidential and must not be released if disclosure of the records may compromise the confidentiality, integrity, or availability of cybersecurity of election information systems.
(3) The secretary of state's duly authorized agents shall have access to the electronic pollbook software and complete the security verification required by the department to access the electronic pollbook software.

R 168.43 Download and backup.
Rule 3. (1) For the early voting period, if a jurisdiction conducts early voting, the clerk designated in the early voting agreement shall access the early voting electronic pollbook software as instructed by the department.
(2) For election day, the clerk conducting the election shall download the electronic pollbook software as instructed by the department.
(3) If the electronic pollbook software as described in section 668b(1) of the act, MCL 168.668b, has a secure live connection to the qualified voter file software at a polling place or early voting site, the electronic pollbook software with the secure live connection must be used to process voters and to generate election precinct reports, and the downloaded electronic pollbook software, or a paper copy of the downloaded electronic pollbook software, serves as a backup.

R 168.44 Electronic pollbook during the early voting period.
Rule 4. (1) If an early voting site has internet access, the electronic pollbook software used during the early voting period must have a secure live connection to the qualified voter file software to allow real-time updates to voter history and ballot issuance.
(2) At the conclusion of each day of early voting, election inspectors at an early voting site shall print from the electronic pollbook a list of voters who voted that day at the early voting site and include the list in the physical pollbook.

R 168.45 Electronic pollbook on election day.
Rule 5. If a polling place has internet access and the bureau of elections has established live connectivity functionality with the qualified voter file, the electronic pollbook software used on election day must have a secure live connection to the qualified voter file software to allow real-time updates to voter history and ballot issuance.

R 168.46 Production of reports.
Rule 6. (1) If the polling place produces required reports after the close of polls on election day, election inspectors at the polling place shall print from the electronic pollbook the required reports and include the reports in the physical pollbook.
(2) If the receiving board produces reports after the close of polls on election day, election inspectors shall download the required reports to the approved form of transmission, seal it in a transfer case, and 2 election inspectors representing each of the major political parties shall deliver it to the receiving board. The receiving board shall print from the approved form of transmission the required reports for the election day polling place, early voting site, or vote center and include the list in the physical pollbook.

R 168.47 Upload of electronic pollbook files to the qualified voter file.

Rule 7. If the electronic pollbook is not connected via secure live connection to the qualified voter file while voting takes place, within 7 days after an election, the clerk responsible for administering the election shall upload the voting history and other required files from the electronic pollbook to the qualified voter file using the approved form of transmission.

R 168.48 Data retention.

Rule 8. (1) Subject to subrule (2) of this rule, the electronic pollbook software and associated files must be deleted from all devices by the seventh day following the final canvass and certification of the election, unless a petition for recount has been filed and the recount has not been completed, a post-election audit has been scheduled, or the deletion of the data has been stayed by an order of the court or the secretary of state. If a precinct is selected for an audit, the electronic pollbook software and associated files must be deleted from all devices by the seventh day following completion of the audit.

(2) The electronic pollbook software and associated files must not be deleted from devices until the bureau of elections or county clerk, as applicable, issues the release of security memorandum pertaining to that election.

**Michigan Office of Administrative Hearings and Rules**
**Administrative Rules Division (ARD)**
MOAHR-Rules@michigan.gov

# REGULATORY IMPACT STATEMENT and COST-BENEFIT ANALYSIS (RIS)

## AGENCY INFORMATION:

**Department name:**
State

**Bureau name:**
Elections & Campaign Finance

**Name of person filling out RIS:**
Jenny McInerney

**Phone number of person filling out RIS:**
517-331-7825

**Email of person filling out RIS:**
McInerneyJ1@michigan.gov

## RULE SET INFORMATION:

**ARD assigned rule set number:**
2025-14 ST

**Title of proposed rule set:**
Use of Electronic Pollbook

## COMPARISON OF RULE(S) TO FEDERAL/STATE/ASSOCIATION STANDARDS

1. **Compare the proposed rules to parallel federal rules or standards set by a state or national licensing agency or accreditation association, if any exist.**
There are no parallel federal rules or standards.

   A. **Are these rules required by state law or federal mandate?**
   MCL 168.31(1)(a) says the secretary of state shall "issue instructions and promulgate rules pursuant to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328, for the conduct of elections and registrations in accordance with the laws of this state."

   B. **If these rules exceed a federal standard, please identify the federal standard or citation, describe why it is necessary that the proposed rules exceed the federal standard or law, and specify the costs and benefits arising out of the deviation.**
   The rules do not exceed a federal standard.

2. **Compare the proposed rules to standards in similarly situated states, based on geographic location, topography, natural resources, commonalities, or economic similarities.**
Minnesota prohibits the connection of electronic pollbooks (EPBs) to the internet. Indiana, Maryland, and New Mexico EPBs are networked and receive immediate updates on who has voted at other voting locations. Michigan currently uses a live-connected electronic pollbook for early voting and Election Day vote centers, and this would expand their use to Election Day polling places. Similarly to Indiana, Maryland, and New Mexico, Michigan's EPBs would be connected to the QVF and would receive immediate live updates on voting activity.

   A. **If the rules exceed standards in those states, please explain why and specify the costs and benefits arising out of the deviation.**
   The rules do not exceed standards in other states.

3. **Identify any laws, rules, and other legal requirements that may duplicate, overlap, or conflict with the proposed rules.**

There are no laws, rules, or other legal requirements that duplicate, overlap, or conflict with the proposed rules.

A. **Explain how the rules have been coordinated, to the extent practicable, with other federal, state, and local laws applicable to the same activity or subject matter. This section should include a discussion of the efforts undertaken by the agency to avoid or minimize duplication.**
The rules provide additional context for MCL 168.668b of the Michigan Election Law. Section 668b requires jurisdictions to download the electronic pollbook beginning at 4pm on the day before Election Day (or beginning at 2pm on the Saturday preceding Election Day, for populous jurisdictions). The rules would clarify that the download must be completed as provided in statute and that it serves as a backup to a live connected electronic pollbook. There is nothing that needs to be coordinated with the rules.

## PURPOSE AND OBJECTIVES OF THE RULE(S)

4. **Identify the behavior and frequency of behavior that the proposed rules are designed to alter.**
Historically, clerks have downloaded the voting list to the electronic pollbook pursuant to MCL 168.668b, and the electronic pollbook has been offline on Election Day. Following the adoption of Proposal 2022-2 and the inclusion of its provisions in the Michigan Constitution, early voting was offered to voters for 9 days ahead of statewide and federal elections. Because of the many voter activities that occur during the early voting period (registration, the return of absent voter ballots, etc.) the early voting electronic pollbook was connected to the internet via a secure live connection during the early voting period. Similarly, the Vote Center electronic pollbook was connected to the internet via a secure live connection, as it concerns voters who are registered on Election Day (and those voters are immediately added to the Qualified Voter File.) However, the Election Day electronic pollbook was still not connected to the internet following the download provided in section 668b. As they do currently, under the rules clerks would still download the electronic pollbook at 4pm or 2pm, as applicable, but that would serve as a backup if they did not have internet connectivity for any reason. Unlike current practice, on Election Day, election inspectors would use the live-connected electronic pollbook rather than the downloaded copy.

Moving the Election Day electronic pollbook to a secure live connection (to mirror the early voting pollbook and Vote Center pollbook) would alter the behavior of clerks for all elections—generally three elections per year (May, August, and November), but four elections in presidential election years (February in addition to the aforementioned elections), and special elections, when applicable.

A. **Estimate the change in the frequency of the targeted behavior expected from the proposed rules.**
Because secure live connection is not currently used on Election Day, but would be used for all elections going forward, the frequency would increase from zero times per year to approximately three or four times per year.

B. **Describe the difference between current behavior/practice and desired behavior/practice.**
Secure live connection is not currently used on Election Day but would be used for all elections going forward.

C. **What is the desired outcome?**
The desired outcome is a secure live connection between the electronic pollbook and Michigan's Qualified Voter File. This would provide real-time updates of information to election inspectors and clerks, to show if a voter has already submitted a ballot and prevent the issuance of more than one ballot to a voter.

5. **Identify the harm resulting from the behavior that the proposed rules are designed to alter and the likelihood that the harm will occur in the absence of the rule.**
When the electronic pollbook is offline, election inspectors must call a clerk when a voter appears to vote and the electronic pollbook (last updated at 4pm on the day before Election Day) indicates that the voter was sent an absentee ballot and the ballot has not been returned. The clerk then has to check if the ballot was returned after the time of the download. Because the voter may not vote twice, either (a) the clerk must cancel the issued absentee ballot in QVF so that the voter may vote in person (and the absentee ballot, even if it is later returned, is not counted) or (b) the clerk tells the election inspector that the voter has returned their absentee ballot and may not be issued an Election Day ballot.

A live electronic pollbook would eliminate this process. Because it would update QVF in real time, election inspectors would be able to see if the absentee ballot has been returned at the moment a voter requests an Election Day ballot. If it had not, they could issue an Election Day ballot, thereby cancelling the absentee ballot. If it had, they would allow the absentee ballot to be tabulated and refuse to issue an Election Day ballot.

Additionally, a single type of electronic pollbook would create greater efficiency for the Bureau of Elections in making updates and more clarity for clerks in using a single system.

A. **What is the rationale for changing the rules instead of leaving them as currently written?**
There are no pre-existing rules to modify.

6. **Describe how the proposed rules protect the health, safety, and welfare of Michigan citizens while promoting a regulatory environment in Michigan that is the least burdensome alternative for those required to comply.**
The proposed rules would simplify the system for Michigan voters but generally would not have an impact on the health, safety, or welfare of Michigan citizens.

7. **Describe any rules in the affected rule set that are obsolete or unnecessary and can be rescinded.**
There are no obsolete or unnecessary rules in the rule set that can be rescinded because these rules create a new rule set and there is no existing rule set.

## FISCAL IMPACT ON THE AGENCY

Fiscal impact is an increase or decrease in expenditures from the current level of expenditures, i.e., hiring additional staff, higher contract costs, programming costs, changes in reimbursements rates, etc. over and above what is currently expended for that function. It does not include more intangible costs for benefits, such as opportunity costs, the value of time saved or lost, etc., unless those issues result in a measurable impact on expenditures.

8. **Please provide the fiscal impact on the agency (an estimate of the cost of rule imposition or potential savings for the agency promulgating the rule).**
The savings would be at the state and local level. The creation and maintenance of a single type of electronic pollbook would create greater efficiency at the state level because staff would not need to make duplicative updates and fixes across multiple system. Additionally, the state would field fewer questions from clerks about the electronic pollbook with a streamlined single system.

At the local level, clerks would spend less time training election inspectors on the differences between the two systems.

9. **Describe whether or not an agency appropriation has been made or a funding source provided for any expenditures associated with the proposed rules.**
No specific agency appropriation has been made for these proposed rules.

10. **Describe how the proposed rules are necessary and suitable to accomplish their purpose, in relationship to the burden(s) the rules place on individuals. Burdens may include fiscal or administrative burdens, or duplicative acts.**
The rules are not anticipated to place a burden on individuals and will instead alleviate current burdens. The rules would extend the popular improvements in the early voting electronic pollbook and the Vote Center electronic pollbook to the Election Day electronic pollbook.

A. **Despite the identified burden(s), identify how the requirements in the rules are still needed and reasonable compared to the burdens.**
There are no expected burdens on individuals.

## IMPACT ON OTHER STATE OR LOCAL GOVERNMENTAL UNITS

11. **Estimate any increase or decrease in revenues to other state or local governmental units (i.e., cities, counties, school districts) as a result of the rule. Estimate the cost increases or reductions for other state or local governmental units (i.e., cities, counties, school districts) as a result of the rule. Include the cost of equipment, supplies, labor, and increased administrative costs in both the initial imposition of the rule and any ongoing monitoring.**
There are no estimated increases or decreases in revenue to other state or local governmental units. There are no estimated increases or reductions in cost to other state or local governmental units.

**12. Discuss any program, service, duty, or responsibility imposed upon any city, county, town, village, or school district by the rules.**
Michigan election officials with internet access will be required to use a secure live connection to access the online version of the electronic pollbook.

**A. Describe any actions that governmental units must take to be in compliance with the rules. This section should include items such as record keeping and reporting requirements or changing operational practices.**
To be in compliance with the proposed rules, Michigan election officials with internet access will be required to use the online/live connected version of the electronic pollbook. This version is already used for early voting and Vote Centers, so the change in operational practices is minimal and will minimize operational requirements, as live connectivity will allow certain data to update in real time rather than via an upload in the days following an election.

**13. Describe whether or not an appropriation to state or local governmental units has been made or a funding source provided for any additional expenditures associated with the proposed rules.**
There will not be any increase of decrease to funding to other state or local government units.

## RURAL IMPACT

**14. In general, what impact will the rules have on rural areas?**
The proposed rules are not expected to impact rural areas.

**A. Describe the types of public or private interests in rural areas that will be affected by the rules.**
The proposed rules should have no impact on public or private interests in rural areas.

## ENVIRONMENTAL IMPACT

**15. Do the proposed rules have any impact on the environment? If yes, please explain.**
The proposed rules will not have an impact on the environment.

## SMALL BUSINESS IMPACT STATEMENT

**16. Describe whether and how the agency considered exempting small businesses from the proposed rules.**
Small businesses will not be governed or impacted by the proposed rules, so the agency did not consider small businesses.

**17. If small businesses are not exempt, describe (a) the manner in which the agency reduced the economic impact of the proposed rules on small businesses, including a detailed recitation of the efforts of the agency to comply with the mandate to reduce the disproportionate impact of the rules upon small businesses as described below (in accordance with MCL 24.240(1)(a-d)), or (b) the reasons such a reduction was not lawful or feasible.**
The proposed rules do not apply to small businesses.

**A. Identify and estimate the number of small businesses affected by the proposed rules and the probable effect on small businesses.**
The proposed rules do not apply to small businesses.

**B. Describe how the agency established differing compliance or reporting requirements or timetables for small businesses under the rules after projecting the required reporting, record-keeping, and other administrative costs.**
The proposed rules do not apply to small businesses and will not have an impact on their reporting requirements.

**C. Describe how the agency consolidated or simplified the compliance and reporting requirements for small businesses and identify the skills necessary to comply with the reporting requirements.**

The agency did not consolidate or simplify the compliance and reporting requirements for small businesses as the proposed rules do not apply to small businesses.

D. **Describe how the agency established performance standards to replace design or operation standards required by the proposed rules.**
The proposed rules do not apply to performance, design, or operation standards in relation to small businesses.

18. **Identify any disproportionate impact the proposed rules may have on small businesses because of their size or geographic location.**
The proposed rule set will have no disproportionate impact on small businesses.

19. **Identify the nature of any report and the estimated cost of its preparation by small businesses required to comply with the proposed rules.**
There are no estimated costs for small businesses as the proposed rules do not apply to small businesses.

20. **Analyze the costs of compliance for all small businesses affected by the proposed rules, including costs of equipment, supplies, labor, and increased administrative costs.**
The proposed rule set will have no impact on small businesses and require no compliance from small businesses.

21. **Identify the nature and estimated cost of any legal, consulting, or accounting services that small businesses would incur in complying with the proposed rules.**
The proposed rule set will have no impact on small businesses and require no legal, consulting, or accounting services on behalf of small businesses.

22. **Estimate the ability of small businesses to absorb the costs without suffering economic harm and without adversely affecting competition in the marketplace.**
There are no costs for small businesses to absorb.

23. **Estimate the cost, if any, to the agency of administering or enforcing a rule that exempts or sets lesser standards for compliance by small businesses.**
There will be no costs to the agency of administering or enforcing a rule that exempts or sets lesser standards for compliance for small businesses.

24. **Identify the impact on the public interest of exempting or setting lesser standards of compliance for small businesses.**
There is no impact on the public interest by exempting or setting lesser standards of compliance for small business.

25. **Describe whether and how the agency has involved small businesses in the development of the proposed rules.**
The agency has not involved small businesses in the development of the proposed rules.

A. **If small businesses were involved in the development of the rules, please identify the business(es).**
Small businesses were not involved in the development of the proposed rules.

## COST-BENEFIT ANALYSIS OF RULES (INDEPENDENT OF STATUTORY IMPACT)

26. **Estimate the actual statewide compliance costs of the rule amendments on businesses or groups.**
There will be no compliance costs on businesses or groups.

A. **Identify the businesses or groups who will be directly affected by, bear the cost of, or directly benefit from the proposed rules.**
The rules do not affect businesses. The rules will directly benefit the 1604 county, city, and township clerks and several thousand election inspectors, all of whom use electronic pollbooks in administering elections in Michigan. There may also be a benefit to Michigan voters, as a streamlined, consistent, real-time system may provide minimal time savings when voting.

B. **What additional costs will be imposed on businesses and other groups as a result of these proposed rules (i.e., new equipment, supplies, labor, accounting, or recordkeeping)? Please identify the types and number of businesses and groups. Be sure to quantify how each entity will be affected.**
There will be no costs imposed on businesses and other groups as a result of these proposed rules.

**27. Estimate the actual statewide compliance costs of the proposed rules on individuals (regulated individuals or the public). Include the costs of education, training, application fees, examination fees, license fees, new equipment, supplies, labor, accounting, or recordkeeping.**
There will be no additional statewide compliance cost. The Bureau is making updates to the early voting electronic pollbook in response to user feedback following its first year of use in 2024; those updates will be extended to the Election Day electronic pollbook.

**A. How many and what category of individuals will be affected by the rules?**
Michigan's 1,604 county and local clerks, thousands of election inspectors, and BOE staff who maintain the electronic pollbook will be positively affected. Additionally, it is anticipated that under the rules all of Michigan's 7.3 million registered voters will be issued ballots using the single electronic pollbook (whereas now early voters and those voting at Vote Centers are issued ballots using the online version and those voting at their Election Day polling place are issued ballots using the offline version); it is unlikely that voters will notice any difference.

**B. What qualitative and quantitative impact do the proposed changes in rules have on these individuals?**
Qualitatively, clerks, election inspectors, and BOE staff will maintain and use a single system rather than two parallel systems, which will lead to greater efficiency. There is no anticipated qualitative impact on registered voters, except for possible minimal time savings.

Quantitatively, there is no anticipated impact.

**28. Quantify any cost reductions to businesses, individuals, groups of individuals, or governmental units as a result of the proposed rules.**
The rules are expected to result in a cost reduction to governmental units charged with administering elections because a single system rather than two parallel systems would have to be maintained, but the amount of the expected savings is unknown. The rules are not expected to have any cost impact to businesses, individuals, or groups or individuals outside of individuals that are part of governmental units charged with administering elections.

**29. Estimate the primary and direct benefits and any secondary or indirect benefits of the proposed rules. Please provide both quantitative and qualitative information, as well as any assumptions.**
In primary or direct benefits, the proposed rules will allow for greater efficiency because clerks, election inspectors, and BOE staff will be using, maintaining, and accessing a single system. Additionally, the single system will be simplified and streamlined to incorporate feedback from the first year the online electronic pollbook was used (for early voting, in 2024). In secondary or indirect benefits, BOE staff and contractors will be freed up from performing duplicative tasks and will be able to perform needed work on other projects. The department assumes that a simplified and streamlined single system provides a qualitative benefit to clerks, election inspectors, and BOE staff who need to use, maintain, and access that system. There is no relevant quantitative information or assumptions related to quantities as no quantities are being affected by these rules.

**30. Explain how the proposed rules will impact business growth and job creation (or elimination) in Michigan.**
The proposed rules will not impact business growth and job creation in Michigan. The rules are not anticipated to result in job creation or elimination.

**31. Identify any individuals or businesses who will be disproportionately affected by the rules as a result of their industrial sector, segment of the public, business size, or geographic location.**
There are no individuals or businesses who will be disproportionately affected by the rules.

**32. Identify the sources the agency relied upon in compiling the regulatory impact statement, including the methodology utilized in determining the existence and extent of the impact of the proposed rules and a cost-benefit analysis of the proposed rules.**
The agency relied upon the Department's current practice and comments provided by county, city, and township clerks, especially those submitted during a Lean Process Improvement workshop completed in January regarding potential improvements to the electronic pollbook. By far the most common request was making the Election Day electronic pollbook as similar as possible to the early voting electronic pollbook.

**A. How were estimates made, and what assumptions were made? Include internal and external sources, published reports, information provided by associations or organizations, etc., that demonstrate a need for the proposed rules.**
The Lean Process Improvement's report on identified improvements relied on survey feedback from over 350 stakeholders, of whom 66% were city and township clerks, 4% were county clerks, 12% were deputy clerks, 6% were election directors, and 12% were other parties. The following are a sample of the feedback received:

1. Making the switch the online version (like Early Voting EPB) for Election Day EPB

2. Election Day Poll Book should be the same as the Early Voting poll book. Election Day Poll book especially the ballot summary is a nightmare after a 16-hour day. The entire platform needs to be revamped and easier to use for all including the elderly which consists of almost all my election workers.

3. I would like to see the EV poll book implemented on election day. It makes sense, easier to navigate and less training for workers that only work a few times a year.

4. It would be nice if the Election Day poll book was live like during the early voting. It is cumbersome with voters that have been sent a ballot but not returned them. Early voting EPB runs so much more efficient and simplified.

5. Now that we have had the year 2024 under our belt with LIVE PB. It would be nice to allow Election Day EPB to be LIVE too.

6. Please think about EV and Election Day being the same Poll Book.

7. Make it live.

8. I would strongly advise a legislative push/policy change to allow the EPB to be online/live, similar to the EV EPB. Not only would this allow for greater protection from error (for example, someone voting, then registering to vote and voting in another place on election day, OR someone voting in person, then dropping off an AV ballot). While I understand there are procedural things in place to help with this, it would take significant work (on the day of the election) off the clerk if the EPB was live online and could cross check for these items. And it would add protection in case these steps were missed.

9. Having the election day poll book online (like the Early Voting Poll Book) would save my office from receiving hundreds of election worker phone calls on election day about spoiling/invalidating av ballots.

10. If the EPB could be set up to be live like the Early Voting computer is, Election Day would run faster and smoother. It is extremely helpful having the information in real time with the number of people who register to vote on Election Day and the people who turn in their absentee ballot on Election Day.

11. It would be nice for the Election day poll book to be online like the EV Poll book and still have the downloaded Poll book as a back up option going forward.

12. There is just enough difference between the EVEPB and the ED EPB to make it confusing for our EPB workers. I love the live update capability of the EVEPB. It would be nice if they were combined into one improved system.

13. I would support a live EPB as used in Early Voting for Election Day. This would be consistent for election workers, provide a live database to eliminate typing in newly registered voters, and reduce errors.

14. The election inspectors that work both election day and early voting prefer the format of the early voting EPB.

15. I would like it to be more like the Early Voting EPB.

16. It would be a great feature if the pollbook was live on election day as it is during early voting.

17. It would be nice if the ED poll book could be in real time.

18. Live QVF, Setup like the Early Voting EPB. Seems silly that the Election Day EPB would be different than EV EPB, especially the livetime function.

19. Come up with a system like the Early Voting Poll Book for jurisdictions with internet to use. The "real-time" data is more efficient and would help reduce fraud.

## ALTERNATIVE TO REGULATION

**33. Identify any reasonable alternatives to the proposed rules that would achieve the same or similar goals.**
The only reasonable alternative to the proposed rules that would achieve the same or similar goals is amendment of the Michigan Election Law to explicitly require live connectivity to be used on Election Day. However, the Department cannot amend the law, so there is no reasonable alternative that is within the Department's control.

**A. Please include any statutory amendments that may be necessary to achieve such alternatives.**
The alternative would likely provide for an explicit allowance for live connectivity to be added to the Michigan Election Law in MCL 168.668b.

**34. Discuss the feasibility of establishing a regulatory program similar to that proposed in the rules that would operate through private market-based mechanisms. Please include a discussion of private market-based systems utilized by other states.**
There are no private market-based mechanisms available to address the needs covered by the proposed rules.

**35. Discuss all significant alternatives the agency considered during rule development and why they were not incorporated into the rules. This section should include ideas considered both during internal discussions and discussions with stakeholders, affected parties, or advisory groups.**
The proposed rules represent the only reasonable procedure going forward. The Bureau has sent the rules out to the county and municipal clerk associations for initial feedback and the only additional suggestion was that the rules include specific procedures for when and how electronic pollbooks should be switched between online and offline functionality (in the case of an internet outage, etc). However, the Bureau determined that specific procedures were more appropriate for instructions issued periodically as needed, as the procedure may change slightly from year to year to address technological changes and potential future efficiencies.

## ADDITIONAL INFORMATION

**36. As required by MCL 24.245b(1)(c), please describe any instructions regarding the method of complying with the rules, if applicable.**
The rules explicitly inform persons of requirements and methods of compliance.

Department of State
Elections & Campaign Finance
Administrative Rules for Use of Electronic Pollbook
Rule Set 2025-14 ST

# NOTICE OF PUBLIC HEARING

**Tuesday, July 15, 2025**
**09:30 AM**

**Public Meeting Room A**
**Delta Charter Township Building, 7710 West Saginaw Hwy, Lansing, MI 48917**

The Department of State will hold a public hearing to receive public comments on proposed changes to the Use of Electronic Pollbook rule set.

To provide that an electronic pollbook must have a secure live connection to the Qualified Voter File while voting is taking place, if the site has internet access. Further, to provide that the electronic pollbook software download provided in MCL 168.668b must still take place and serve as backup to the live connection.

By authority conferred on the secretary of state by section 31 of the Michigan election law, 1954 PA 116, MCL 168.31.

The proposed rules will take effect immediately after filing with the Secretary of State. The proposed rules are published on the State of Michigan's website at http://www.michigan.gov/ARD and in the 7/1/2025 issue of the Michigan Register. Copies of these proposed rules may also be obtained by mail or email at the following email address: Elections-PublicComment@Michigan.gov.

Comments on these proposed rules may be made at the hearing, by mail, or by email at the following addresses until 7/15/2025 at 05:00 PM:

Bureau of Elections
P.O. Box 20126, Lansing, Michigan 48901-0726
Elections-PublicComment@Michigan.gov

The public hearing will be conducted in compliance with the 1990 Americans with Disabilities Act. If the hearing is held at a physical location, the building will be accessible with handicap parking available. Anyone needing assistance to take part in the hearing due to disability may call 800-292-5973 to make arrangements.

DEPARTMENT OF STATE

BUREAU OF ELECTIONS

USE OF ELECTRONIC POLLBOOK

Filed with the secretary of state on

These rules become effective immediately after filing with the secretary of state unless adopted under section 33, 44, or 45a(9) of the administrative procedures act of 1969, 1969 PA 306, MCL 24.233, 24.244, or 24.245a. Rules adopted under these sections become effective 7 days after filing with the secretary of state.

(By authority conferred on the secretary of state by section 31 of the Michigan election law, 1954 PA 116, MCL 168.31)

R 168.41, R 168.42, R 168.43, R 168.44, R 168.45, R 168.46, R 168.47, and R 168.48 are added to the Michigan Administrative Code, as follows:

R 168.41 Definitions.

Rule 1. (1) As used in these rules:

(a) "Act" means the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992.

(b) "Approved form of transmission" means an encrypted or password protected, or both, flash drive or other electronic media used to store election files and transfer files between the electronic pollbook and qualified voter file, or another form of secure storage and transmission if approved by the bureau of elections.

(c) "Department" means the department of state.

(d) "Electronic pollbook" means computer software that receives information from the qualified voter file and is used during elections to process voters and generate reports. Electronic pollbook includes, but is not limited to, the early voting electronic pollbook, the election day vote center electronic pollbook, and the election day electronic pollbook, or any combination of those electronic pollbooks.

(e) "Secretary of state's duly authorized agent" includes bureau of elections staff, other necessary department staff, county, city, and township clerks or their designees, election inspectors, and relevant department of technology, management, and budget staff as determined by the director of elections.

(2) Unless otherwise defined in these rules, a term defined in the act has the same meaning when used in these rules.

R 168.42 Access to electronic pollbook data and software.

Rule 2. (1) The voter data contained in the electronic pollbook are public records subject to the freedom of information act, 1976 PA 442, MCL 15.231 to 15.246. Voter data that is exempt from disclosure under section 13 of the freedom of information act, 1976 PA 442, MCL 15.243, must not be released.

(2) Records regarding electronic pollbook software programming are confidential and must not be released if disclosure of the records may compromise the confidentiality, integrity, or availability of cybersecurity of election information systems.

(3) The secretary of state's duly authorized agents shall have access to the electronic pollbook software and complete the security verification required by the department to access the electronic pollbook software.

R 168.43 Download and backup.

Rule 3. (1) For the early voting period, if a jurisdiction conducts early voting, the clerk designated in the early voting agreement shall access the early voting electronic pollbook software as instructed by the department.

(2) For election day, the clerk conducting the election shall download the electronic pollbook software as instructed by the department.

(3) If the electronic pollbook software as described in section 668b(1) of the act, MCL 168.668b, has a secure live connection to the qualified voter file software at a polling place or early voting site, the electronic pollbook software with the secure live connection must be used to process voters and to generate election precinct reports, and the downloaded electronic pollbook software, or a paper copy of the downloaded electronic pollbook software, serves as a backup.

R 168.44 Electronic pollbook during the early voting period.

Rule 4. (1) If an early voting site has internet access, the electronic pollbook software used during the early voting period must have a secure live connection to the qualified voter file software to allow real-time updates to voter history and ballot issuance.

(2) At the conclusion of each day of early voting, election inspectors at an early voting site shall print from the electronic pollbook a list of voters who voted that day at the early voting site and include the list in the physical pollbook.

R 168.45 Electronic pollbook on election day.

Rule 5. If a polling place has internet access and the bureau of elections has established live connectivity functionality with the qualified voter file, the electronic pollbook software used on election day must have a secure live connection to the qualified voter file software to allow real-time updates to voter history and ballot issuance.

R 168.46 Production of reports.

Rule 6. (1) If the polling place produces required reports after the close of polls on election day, election inspectors at the polling place shall print from the electronic pollbook the required reports and include the reports in the physical pollbook.

(2) If the receiving board produces reports after the close of polls on election day, election inspectors shall download the required reports to the approved form of transmission, seal it in a transfer case, and 2 election inspectors representing each of the major political parties shall deliver it to the receiving board. The receiving board shall print from the approved form of transmission the required reports for the election day polling place, early voting site, or vote center and include the list in the physical pollbook.

R 168.47 Upload of electronic pollbook files to the qualified voter file.

Rule 7. If the electronic pollbook is not connected via secure live connection to the qualified voter file while voting takes place, within 7 days after an election, the clerk responsible for administering the election shall upload the voting history and other required files from the electronic pollbook to the qualified voter file using the approved form of transmission.

R 168.48 Data retention.

Rule 8. (1) Subject to subrule (2) of this rule, the electronic pollbook software and associated files must be deleted from all devices by the seventh day following the final canvass and certification of the election, unless a petition for recount has been filed and the recount has not been completed, a post-election audit has been scheduled, or the deletion of the data has been stayed by an order of the court or the secretary of state. If a precinct is selected for an audit, the electronic pollbook software and associated files must be deleted from all devices by the seventh day following completion of the audit.

(2) The electronic pollbook software and associated files must not be deleted from devices until the bureau of elections or county clerk, as applicable, issues the release of security memorandum pertaining to that election.

DEPARTMENT OF STATE

BUREAU OF ELECTIONS

USE OF ELECTRONIC POLLBOOK

Filed with the secretary of state on October 23, 2025

These rules become effective immediately after filing with the secretary of state unless adopted under section 33, 44, or 45a(9) of the administrative procedures act of 1969, 1969 PA 306, MCL 24.233, 24.244, or 24.245a. Rules adopted under these sections become effective 7 days after filing with the secretary of state.

(By authority conferred on the secretary of state by section 31 of the Michigan election law, 1954 PA 116, MCL 168.31)

R 168.41, R 168.42, R 168.43, R 168.44, R 168.45, R 168.46, R 168.47, and R 168.48 are added to the Michigan Administrative Code, as follows:

R 168.41 Definitions.

Rule 1. (1) As used in these rules:

(a) “Act” means the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992.

(b) “Approved form of transmission” means an encrypted or password protected, or both, flash drive or other electronic media used to store election files and transfer files between the electronic pollbook and qualified voter file, or another form of secure storage and transmission if approved by the bureau of elections.

(c) “Department” means the department of state.

(d) “Electronic pollbook” means computer software that receives information from the qualified voter file and is used during elections to process voters and generate reports. Electronic pollbook includes, but is not limited to, the early voting electronic pollbook, the election day vote center electronic pollbook, and the election day electronic pollbook, or any combination of those electronic pollbooks.

(e) “Secretary of state’s duly authorized agent” includes bureau of elections staff, other necessary department staff, county, city, and township clerks or their designees, election inspectors, and relevant department of technology, management, and budget staff as determined by the director of elections.

(2) Unless otherwise defined in these rules, a term defined in the act has the same meaning when used in these rules.

R 168.42 Access to electronic pollbook data and software.

Rule 2. (1) The voter data contained in the electronic pollbook are public records subject to the freedom of information act, 1976 PA 442, MCL 15.231 to 15.246. Voter data that is exempt from disclosure under section 13 of the freedom of information act, 1976 PA 442, MCL 15.243, must not be released.

(2) Records regarding electronic pollbook software programming are confidential and must not be released if disclosure of the records may compromise the confidentiality, integrity, or availability of cybersecurity of election information systems.

(3) The secretary of state's duly authorized agents shall have access to the electronic pollbook software and complete the security verification required by the department to access the electronic pollbook software.

R 168.43 Download and backup.

Rule 3. (1) For the early voting period, if a jurisdiction conducts early voting, the clerk designated in the early voting agreement shall access the early voting electronic pollbook software as instructed by the department.

(2) For election day, the clerk conducting the election shall download the electronic pollbook software as instructed by the department.

(3) If the electronic pollbook software as described in section 668b(1) of the act, MCL 168.668b, has a secure live connection to the qualified voter file software at a polling place or early voting site, the electronic pollbook software with the secure live connection must be used to process voters and to generate election precinct reports, and the downloaded electronic pollbook software, or a paper copy of the downloaded electronic pollbook software, serves as a backup.

R 168.44 Electronic pollbook during the early voting period.

Rule 4. (1) If an early voting site has internet access, the electronic pollbook software used during the early voting period must have a secure live connection to the qualified voter file software to allow real-time updates to voter history and ballot issuance.

(2) At the conclusion of each day of early voting, election inspectors at an early voting site shall print from the electronic pollbook a list of voters who voted that day at the early voting site and include the list in the physical pollbook.

R 168.45 Electronic pollbook on election day.

Rule 5. If a polling place has internet access and the bureau of elections has established live connectivity functionality with the qualified voter file, the electronic pollbook software used on election day must have a secure live connection to the qualified voter file software to allow real-time updates to voter history and ballot issuance.

R 168.46 Production of reports.

Rule 6. (1) If the polling place produces required reports after the close of polls on election day, election inspectors at the polling place shall print from the electronic pollbook the required reports and include the reports in the physical pollbook.

(2) If the receiving board produces reports after the close of polls on election day, election inspectors shall download the required reports to the approved form of transmission, seal it in a transfer case, and 2 election inspectors representing each of the major political parties shall deliver it to the receiving board. The receiving board shall print from the approved form of transmission the required reports for the election day polling place, early voting site, or vote center and include the list in the physical pollbook.

R 168.47 Upload of electronic pollbook files to the qualified voter file.

Rule 7. If the electronic pollbook is not connected via secure live connection to the qualified voter file while voting takes place, within 7 days after an election, the clerk responsible for administering the election shall upload the voting history and other required files from the electronic pollbook to the qualified voter file using the approved form of transmission.

R 168.48 Data retention.

Rule 8. (1) Subject to subrule (2) of this rule, the electronic pollbook software and associated files must be deleted from all devices by the seventh day following the final canvass and certification of the election, unless a petition for recount has been filed and the recount has not been completed, a post-election audit has been scheduled, or the deletion of the data has been stayed by an order of the court or the secretary of state. If a precinct is selected for an audit, the electronic pollbook software and associated files must be deleted from all devices by the seventh day following completion of the audit.

(2) The electronic pollbook software and associated files must not be deleted from devices until the bureau of elections or county clerk, as applicable, issues the release of security memorandum pertaining to that election.

**Michigan Office of Administrative Hearings and Rules**
**Administrative Rules Division (ARD)**
MOAHR-Rules@michigan.gov

# AGENCY REPORT TO THE JOINT COMMITTEE ON ADMINISTRATIVE RULES (JCAR)

## AGENCY INFORMATION:

**Agency name:**
State

**Division/Bureau/Office:**
Elections & Campaign Finance

**Name of person completing this form:**
Jenny McInerney

**Phone number of person completing this form:**
517-331-7825

**Email of person completing this form:**
McInerneyJ1@michigan.gov

**Name of Department Regulatory Affairs Officer reviewing this form:**
Doug Novak

## RULE SET INFORMATION:

**MOAHR assigned rule set number:**
2025-14 ST

**Title of the proposed rule set:**
Use of Electronic Pollbook

1. **Purpose of the proposed rules and background:**
   The purpose of these rules is to clarify rules regarding the electronic pollbook, given technological advances, the introduction of early voting and the early voting pollbook, and the security benefits of real time connection with the Qualified Voter File.

2. **Summary of the proposed rules:**
   To provide that an electronic pollbook must have a secure live connection to the Qualified Voter File while voting is taking place, if the site has internet access. Further, to provide that the electronic pollbook software download provided in MCL 168.668b must still take place and serve as backup to the live connection.

3. **List names of newspapers in which the notice of public hearing was published and publication dates:**
   Marquette Mining Journal—6/14/25
   Adrian Daily Telegram—6/15/25
   Grand Haven Tribune—6/14/25

4. **Date of publication of the proposed rules and notice of public hearing in the Michigan Register:**
   7/1/2025

5. **Date, time, and location of the public hearing:**
   7/15/2025 09:30 AM at Public Meeting Room A, Delta Charter Township Building, 7710 West Saginaw Hwy, Lansing, MI 48917

6. **Provide the link the agency used to post the regulatory impact statement and cost-benefit analysis on its website:**
https://ARS.apps.lara.state.mi.us/Transaction/RFRTransaction?TransactionID=1587

7. **List of the name and title of agency representative(s) who attended the public hearing:**
Jenny McInerney, Michigan Bureau of Elections, Regulatory Attorney
Alessa Boes, Michigan Bureau of Elections, Regulatory Attorney

8. **Persons submitting comments of support:**
Melanie Macey, Promote the Vote, Policy & Government Affairs Director
Ray Moulden, Cannon Township, Election & Technology Specialist

9. **Persons submitting comments of opposition:**
No individual submitted comments in opposition to the rules.

10. **Persons submitting other comments:**
No individual submitted other comments.

11. **Identify any changes made to the proposed rules based on comments received during the public comment period:**
None.

12. **Date report completed:**
5/7/2026

**From:** Melanie Macey
**To:** MDOS-Elections-PublicComment
**Subject:** Promote the Vote comment on 2025-14 ST
**Date:** Tuesday, July 15, 2025 3:44:43 PM

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Promote the Vote writes in support of proposed rule 2025-14-ST, which would require a secure live connection between the electronic pollbook (EPB) and the Qualified Voter File (QVF) during voting, when internet access is available. The success of the live EPB system during early voting in 2024 demonstrates its reliability and builds confidence that extending this functionality to Election Day would significantly enhance both accuracy and efficiency. While procedural safeguards exist to address rare but serious ballot errors, real-time updates offer an added layer of protection and would ease the burden on clerks who currently rely on manual checks and post-election reconciliation.

Importantly, this change would also streamline Election Day operations. Clerks in some jurisdictions report receiving hundreds of phone calls from election workers about absentee ballot issues, many of which could be avoided with real-time access to voter data. A live connection would allow for instant updates as voters register or as absentee ballots are received, improving consistency, reducing confusion among poll workers, and decreasing the risk of data-entry errors. Retaining the pre-downloaded EPB as a backup, as required in statute, ensures election continuity even in the event of connectivity issues. This rule strikes the right balance between modernizing election infrastructure and maintaining reliability.

**Melanie Macey**
Policy & Government Affairs Director | Promote The Vote
734-277-1311 | she/her
www.promotethevotemi.com
https://calendly.com/melanie-macey

*This e-mail message and its attachments are confidential, intended only for the addressee(s) named above and may contain information that is proprietary, privileged, attorney work product or otherwise exempt from disclosure. If you receive this message in error please notify me at melanie@promotethevotemi.com and immediately delete this message and its attachments from your system.*

**From:** Ray Moulden
**To:** MDOS-Elections-PublicComment
**Subject:** Live Connectivity for Polling Places on Election Day
**Date:** Tuesday, July 15, 2025 1:02:05 PM

**CAUTION: This is an External email. Please send suspicious emails to abuse@michigan.gov**

Live connectivity on Election Day between Pollbooks and QVF **ON A SECURE CONNECTION** would be a distinct improvement over the current process.

It would:

1. Reduce the need for calls to the Clerk's Office to verify if an AV Ballot has been received
2. Reduce the burden on Clerks to go into QVF and reject the AV Ballot
3. Speed up the service for the voter since no call to the Clerk is needed.
4. Facilitate a more procedurally similar experience for the voter to Early Voting leading to more voter confidence in the system
5. Reduce training needs for Election Inspectors
6. Reduce the possibilities for double voting

I strongly recommend proceeding with allowing for Live Connectivity on Election Day **AS WE ALREADY DO IN EARLY VOTING**.

Ray Moulden
Election & Technology Specialist
Cannon Township, Kent County
rmoulden@cannontwp.org

No individuals attended or testified at the public hearing regarding Use of Electronic Pollbook, held July 15, 2025, at the Delta Charter Township Building.

DEAR ANNIE

# *Regretting the evidence of having a good time*

**Dear Annie:**

Last year, I married the nicest guy I've ever met. I'm 40 and wish I'd met him sooner, but better late than never. On our month-long honeymoon in Europe, we attended a music festival. During the festival, my husband and I saw some other women in pasties, and in a moment of flirting, I did something totally out of character and bought some pasties myself and a glittery thong. I spent the next day dancing and partying in this revealing attire with my husband. I think everyone needs to have one wild moment in their life, and I had lots of fun.



Annie

After we got home, I found out the festival had hired a photographer to take pictures for their social media accounts. There I was in three photos online wearing only the glittery thong and pasties over my breasts, dancing on a mini stage they set up in the crowd. The pictures are untagged, so no one would connect them to me anyway, and my friends all think I look hot and that it isn't a big deal. I own my own business, so I don't need to worry about employment, and for now, only my friends know. Even so, I'm too embarrassed to tell my husband.

Should I confess to him that I'm in these pictures that will exist forever? Should I try to get the photos removed somehow? Should I even feel embarrassed? When I really think about it, it's probably no big deal, but when the feelings of embarrassment kick in, I don't know what to do!

*— Festival Flashback*

**Dear Festival Flashback:**

Honesty is the best policy, especially in marriage, and this isn't so much a confession to your husband as it is simply sharing with him what you found. He was right there with you, participating in the event, too, even if there are no pictures of him to prove it.

You're in a fortunate position that the pictures don't affect your job or personal life. Still, if contacting the festival or social media account is easy enough, it's worth asking if the photos can be taken down; you may care more later on and wish you had done so sooner. Don't let this happy, carefree, innocent moment in the past become something you beat yourself up for now.

**Dear Annie:**

My wife and I were recently invited to a friend's son's college graduation celebration at a bar two-and-a-half hours from our home. When we arrived and ordered our first drink, we were told all food and drinks were on individual tabs.

Shouldn't the host have mentioned that in the invitation? Is it appropriate to ask about costs like this before RSVPing? My friend could easily have afforded to pick up the check for the gathering. I'm certainly glad I had the money to cover what we ordered.

*— Perplexed About the Etiquette*

**Dear Perplexed:**

Yes, the host should've made that clear in the invitation. If the party had been at their home instead, no one would expect to pay for food or drinks, so it's reasonable to think the same would be true of a different venue, especially one you traveled hours to get to. If the hosts weren't prepared to foot the bill, they should've been upfront about it.

In the future, there's nothing wrong with asking for more details when an invite is vague and especially at public venues again. "Will food and drinks be provided?" is a completely fair question to ask ahead of time, and it lets you make a fully informed decision before committing to anything.

*Annie Lane's second anthology — "How Can I Forgive My Cheating Partner?" featuring favorite columns on marriage, infidelity, communication and reconciliation -- is available as a paperback and e-book. Visit http://www.creatorspublishing.com for more information. Send your questions for Annie Lane to dearannie@creators.com.*

CAR TALK

# *Turn off useful safety feature so you can run into walls*

**Dear Car Talk:**

Our new Toyota Tundra uses ALL of the available space in our garage. And if I want to close the garage door, I have to pull within inches of the front wall.

Here's the problem: The automatic brake system continually hits the brakes for me every time I approach the wall, even though I am just creeping at 1 mph.

Is there a danger in repeatedly having the auto brake system activate when I park each time? Will this damage the brakes?

*— Dan*

**Dear Dan:**

No, but it might damage your neck, Dan.

For those who don't have this feature, lots of newer cars have automatic emergency braking. If the car's sensors conclude that there's an obstacle ahead (a stopped car, for instance), and you haven't given any indication that you're aware of it by taking your foot off the gas or hitting the brakes, the automatic braking system kicks in.

As a first step, the vehicle will issue an audible and/or visual warning. And then, if you continue to browse your wife's sister's Instagram photos while the obstacle gets closer, it will actually apply the brakes for you to prevent a crash.



Magliozzi

Many cars and trucks also have a slow-speed version of this system for use in parking. It works in both forward and reverse. So, if trying to parallel park between two Maseratis, and you're about to take out the hood of the one behind you, the system will warn you and then apply the brakes to keep you from hitting it and having to join the witness protection program.

This can be incredibly useful. It can also be irritating, as you've learned, Dan. So, your vehicle (and most others) allows you to turn off the slow-speed auto brake feature in situations where you'd rather it mind its own business.

On the Tundra, there's a button to the left of your steering wheel with an image of a car making impact with a traffic cone and the word "OFF" underneath it. When you pull into your garage, just press that button.

An orange light with that same image will show up on your dashboard, letting you know that the system is off. You'll still hear the audio warning when the sensors detect a nearby obstacle (like the garage wall), but the truck will not apply its own brakes. Once that light is off, Dan, you are free to drive right into your radial arm saw.

It's also useful for going through a car wash. Just keep in mind that most vehicles will reset the system to "On" when you restart. So, you'll have to hit the button each time you pull into the garage. But that's better than the whiplash, right?

*Got a question about cars? Write to Ray in care of King Features, 628 Virginia Drive, Orlando, FL 32803, or email by visiting the Car Talk website at www.cartalk.com.*

# Panton made first all-plastic chairs in '60s

By TERRY and KIM KOVEL

A chair is a chair is a chair, isn't it? Four legs to stay on the floor, a high back to keep the sitter upright, and maybe a stretcher base for support. And everything is made of wood, of course, with variety coming from upholstery, decorative carvings or the shape of the legs.

That may have been true up to the 20th century. Furniture changed dramatically when designers took advantage of new materials that opened up previously unheard-of possibilities: plastics.

Man-made plastics were used for household implements by the 1920s, but it wasn't until after World War II that the potential for full-sized, functional plastic furniture was realized. One of the most famous plastic chair designs was the Panton chair, named after its designer, Danish architect Verner Panton. Considered the world's first molded plastic chair, it is a cantilevered chair made from a single piece of plastic. Its shape and weight distribution allow it to be made without back legs.

Panton came up with the design in about 1960, but it wasn't until the middle of the decade that he found a manufacturer, German furniture company Vitra, that would make it. Vitra started producing the Panton chair in 1968.

Later, the Vitra Design Museum commemorated the Panton chair with sets of miniature versions in 1-to-6 scale. A group of 14 sold for $100 at an auction by Eldred's; a bargain when compared to the price of a full-sized Panton chair.

The chair is still in production today, and designers are adapting it to contemporary sensibilities by creating versions in eco-friendly materials like bamboo and rattan.

**Question:**

One of my favorite antique pieces is a large copper bowl about 21 inches across. It has a round bottom and fits into a three-legged stand. I think it's for making candy. Can you tell me about it and what it might be worth?

**Answer:**

You're right; copper bowls like yours have been used to make candy, at least since the 1800s. Despite their bowl shape, they are usually called candy kettles. Cooks know that copper has excellent thermal conductivity, meaning that it heats and cools rapidly and spreads heat evenly across its surface. This is especially important for making candy; sugar syrup needs to be heated to precise temperatures and handled very carefully to prevent scorching. Unlike most present-day copper cookware, copper candy kettles are usually unlined. Sugar does not react with copper the way acidic foods do. The rounded bottom of the kettle allows for easier, more thorough mixing.

Today, there are many candy companies that advertise that they use copper kettles, often insisting that discerning customers can taste the difference. Antique and vintage copper candy kettles sell for about $200 to $300 without an identified maker or date. More information generally increases the value.

Check your kettle for marks and take a close look at any seams, rivets or signs of construction. Most copper cookware was entirely handmade before 1850. By the early 1900s, manufacturers used electric machinery.

**Question:**

Can you tell me about my deck of "Go Fish" children's playing cards? The box says "Copyright 1951" and "Mfg. by Ed-U-Cards N.Y.," but I haven't been able to find out more information about the company or the cards' value. I was also told that there is a toy museum that accepts donations of very old toys. Any information you can provide about it is greatly appreciated.

Answer:

The Ed-U-Cards company started in the 1940s in Long Island, New York, and appears to have operated until the 1960s. As the name indicates, they made educational card games for children. These included flashcards and memory games to teach subjects like vocabulary, basic math, science concepts and history. They also made related toys like puzzles and anagram tiles. Many games they made featured popular cartoon characters and other licensed properties. Some of their card games were less overtly educational, like sports games and trading cards.

Decks of Ed-U-Cards decks can be worth anywhere from about $10 to $50, depending on their subject matter and condition. Games with pictures of historical figures or famous fictional characters usually sell for the highest prices.

There is a toy museum called the Strong National Museum of Play in New York (museumofplay.org) that accepts donations of old toys. They are known for their Toy Hall of Fame, which annually inducts a selection of classic toys.

Tip:

Plastic furniture from the 1950s often scratches. A good polishing with automobile wax might help cover the blemishes.

*Register on Kovels.com to access subscriber content for FREE! Learn from our expert answers to readers' questions about marks, values, and identification. Find auction houses, collectors' clubs, museums, repair services, and more in our Business Directory. Discuss antiques and collectibles with other collectors on our forums. Find events on our Event Calendar. Stay up-to-date with our latest news and blog. And sign up on Kovels.com to receive Kovels Komments, our free weekly email full of information about antiques and collectibles. Look for it every Wednesday.*

Department of State
Elections & Campaign Finance
Administrative Rules for Use of Electronic Pollbook
Rule Set 2025-14 ST

NOTICE OF PUBLIC HEARING
Tuesday, July 15, 2025 — 9:30 a.m.

Public Meeting Room A
Delta Charter Township Building, 7710 W. Saginaw Highway,
Lansing, MI 48917

The Department of State will hold a public hearing to receive public comments on proposed changes to the Use of Electronic Pollbook rule set.

The proposed rules would provide that an electronic pollbook must have a secure live connection to the Qualified Voter File while voting is taking place, if the site has internet access. Further, the proposed rules would provide that the electronic pollbook software download provided in MCL 168.668b must still take place and serve as a backup to the live connection.

By authority conferred on the secretary of state by Section 31 of the Michigan Election Law, 1954 PA 116, MCL 168.31.

The proposed rules will take effect immediately after filing with the secretary of state. The proposed rules are published on the State of Michigan's website at Michigan.gov/ARD and in the July 1, 2025, issue of the Michigan Register. Copies of these proposed rules may also be obtained by mail at the address below or by electronic mail at the following email address: Elections-PublicComment@Michigan.gov.

Comments on these proposed rules may be made at the hearing, by mail, or by electronic mail at the following addresses until 5 p.m. on July 15, 2025.

Bureau of Elections
P.O. Box 20126, Lansing, MI 48901-0726
Elections-PublicComment@Michigan.gov

The public hearing will be conducted in compliance with the 1990 Americans with Disabilities Act. If the hearing is held at a physical location, the building will be accessible with handicap parking available. Anyone needing assistance to take part in the hearing due to disability may call 800-292-5973 to make arrangements.

Media Placement one

Powered by the Michigan Press Association

# AFFIDAVIT OF PUBLICATION

1642 Yosemite Dr., Lansing, MI 48917
517.372.2424 solutions@mediaplacementone.com

MPAS MICHIGAN PRESS ASSOCIATION SERVICES

Advertiser: Michigan Dept of State

Date of order: June 10, 2025

This is to certify that the Public Notice scheduled to run in the newspaper listed ran as the placement details below and proof of publication is attached.

Newspaper Name: **Marquette Mining Journal**

| Run Date | Ad Size | Caption/Position/Special Instructions |
|---|---|---|
| 6/14/2025 | 1/4 Page | Public Notice |

Signed by ________________________ (MP1/MANSI Representative)

June 14, 2025

Notary Public:

Signed by ________________________ (Notary Public)

June 14, 2025

**JAMES R. TARRANT**
**NOTARY PUBLIC – STATE OF MICHIGAN**
**COUNTY OF VAN BUREN**
My commission expires April 12, 2029
Acting in the County of Ingham

Case 2:26-cv-13454-TGB-KGA ECF No. 37-2, PageID.696 Filed 10/02/26 Page 31 of 34



the TRIBUNE

The Tribune is published Tuesday through Saturday. Our office, 700 Washington Ave., Suite 140, Grand Haven, is open from 8 a.m. to 4 p.m. Monday through Friday. Our website, www.ghtrib.com, is open 24/7.

**Classifieds:** 616-842-0100 or classifieds@grandhaventribune.com
**Subscriptions:** 616-604-8675 or circulation@grandhaventribune.com
**News:** 616-842-8790 or news@grandhaventribune.com
**Sports:** 616-604-8667 or tmccue@grandhaventribune.com
**Obituaries:** 616-604-8676 or news@grandhaventribune.com
**Opinion/Letters to Editor:** 616-604-8676 or news@grandhaventribune.com
**Community Calendar:** events@grandhaventribune.com
**Editor – MATT DeYOUNG:** 616-604-8672 or mdeyoung@grandhaventribune.com
**Advertisements – AUDRA FITZPATRICK:** 616-604-8675 or afitzpatrick@grandhaventribune.com

This publication and all its content herein is copyrighted.
Periodical postage paid at Grand Haven, Mich., publication No. 225600.

**POSTMASTER:** Send address changes to the Grand Haven Tribune, 700 Washington Ave. Suite 140, Grand Haven, MI 49417.

All subscriptions are non-refundable.

## 13 ON YOUR SIDE WEATHER




| Today | Sunday | Monday | Tuesday | Wednesday | Thursday |
|---|---|---|---|---|---|
| 81 | 84 62 | 85 64 | 86 66 | 84 58 | 82 60 |
| PARTLY CLOUDY | PARTLY CLOUDY | PARTLY CLOUDY | T-STORMS | T-STORMS | T-STORMS |

# AG Nessel issues summer travel tips

**CONTRIBUTED**



Tribune photo / Matt DeYoung

**Michigan's attorney general is warning state residents to be aware of travel scams as summer travel picks up.**

LANSING — As the summer travel season ramps up across the state, Michigan Attorney General Dana Nessel has reissued her travel tips alert to help consumers avoid common travel scams and stay informed about their rights while vacationing.

With many Michiganders planning trips during the warmer months, Nessel released a video urging travelers to remain vigilant when booking and taking vacations.

"Summer is the perfect time to create lasting memories with your family, and that experience shouldn't be disrupted by financial headaches or travel scams," Nessel said. "A few precautions can go a long way in protecting your plans and your wallet."

Nessel encourages travelers to:

**Research agents and booking sites:** Verify phone numbers and websites independently rather than relying on web search results. Check reviews, seek personal recommendations and consult the Better Business Bureau as well as the Attorney General's Consumer Protection Team for information.

**Get promises in writing:** Before providing your payment information, request that all agreements be provided in writing, including any special requests or terms.

**Read contracts carefully:** Pay close attention to fine print, fees, and service charges, especially for "all-inclusive" deals. Make copies of all documents to dispute any unexpected fees.

**Pay with a credit card:** Avoid paying for travel with cash, checks, or prepaid cards. Use a credit card, if possible, preferably a designated travel credit card for booking flights, hotels, and other expenses. Credit cards offer better fraud and cancellation protections than other payment methods.

**Beware of fraudulent listings on vacation rental sites:** Scammers can hijack legitimate listings or create fake properties on vacation home rental websites like Airbnb and Vrbo to lure travelers into sending payments for rentals that don't exist. Always book through verified sources.

Nessel's alert lists some common travel scams, such as:

**Online Booking Scams:** Ensure you are booking directly on the hotel or vacation rental's official website. Third-party booking sites may charge hidden fees, fail to honor special requests, or even fail to make a reservation altogether.

**"Pizza Flyer" Scam:** Flyers slipped under hotel doors that advertise local food delivery may be fraudulent. When ordering, never give your credit card information to unknown sources.

**Fake Front Desk Calls:** Scammers may call your hotel room claiming to be from the front desk and request your credit card information due to a "computer glitch." Always verify by calling the front desk directly.

**Bait-and-Switch Tactics:** Be wary of offers with unrealistically low prices that result in additional charges or pressure to buy more expensive services.

Nessel also encourages consumers to watch for increased fees and surcharges this season, as some travel-related businesses adjust rates to offset inflation and tariffs.

She says to check all costs carefully, including transportation fares, ferry and parking passes, and ensure season passes purchased prior to any rate increase are still honored.

Because of the busy travel season during the summer, some delays on bridges and airlines are to be expected. However, airline passengers are entitled to a refund for:

**Canceled or significantly changed flights:** Passengers will be entitled to a refund if their flight is canceled or significantly changed and they do not accept alternative transportation or offered travel credits. Significant changes to a flight include: departure or arrival times that are more than 3 hours domestically and 6 hours internationally; departures or arrivals from a different airport; increases in the number of connections; instances where passengers are downgraded to a lower class of service; or connections at different airports or flights on different planes that are less accessible or accommodating to a person with a disability.

**Significantly delayed baggage return:** Passengers who file a mishandled baggage report will be entitled to a refund of their checked bag fee if it is not delivered within 12 hours of their domestic flight arriving at the gate, or 15-30 hours of their international flight arriving at the gate, depending on the length of the flight.

**Extra services not provided:** Passengers will be entitled to a refund for the fee they paid for an extra service – such as Wi-Fi, seat selection, or in-flight entertainment – if an airline fails to provide this service.

Airlines are also required to provide automatic, prompt and complete refunds in the same method of payment used by the consumer to purchase their tickets.

"With air travel on the rise in the summer, it's important for passengers to know their rights," said Nessel, who previously served as chair of the U.S. Department of Transportation Aviation Consumer Protection Advisory Committee that evaluates existing aviation consumer protection programs. "Federal regulations ensure you're not footing the bill for canceled flights or lost baggage."

## TODAY IN HISTORY

**By THE ASSOCIATED PRESS**

Today is Saturday, June 14, the 165th day of 2025. There are 200 days left in the year. This is Flag Day.

**In history:**

On June 14, 1940, German troops entered Paris during World War II; the same day, the Nazis transported their first prisoners to the Auschwitz concentration camp in German-occupied Poland.

**Also on this date:**

In 1775, the Continental Army, forerunner of the United States Army, was created by the Second Continental Congress.

In 1777, the Second Continental Congress approved the design of the first "stars and stripes" American flag.

In 1943, the U.S. Supreme Court, in West Virginia State Board of Education v. Barnette, ruled 6-3 that public school students could not be forced to salute the flag of the United States or recite the Pledge of Allegiance.

In 1954, President Dwight D. Eisenhower signed a bill adding the phrase "under God" to the Pledge of Allegiance.

**POLICE**

## No injuries when car strikes building in SL Twp.

**By TRIBUNE STAFF**

SPRING LAKE TWP. — Police say no one was injured when a car slammed into a building in Spring Lake Township early Friday morning.

According to the Ottawa County Sheriff's Office, a 34-year-old Muskegon woman driving a Subaru Crosstrek crashed into the building at Johnson Auto Sales, 14658 Apple Drive.

There were no injuries in the crash, which occurred shortly after midnight, although the building did suffer some damage, police said.

The incident remains under investigation.

Department of State
Elections & Campaign Finance
Administrative Rules for Use of Electronic Pollbook
Rule Set 2025-14 ST

NOTICE OF PUBLIC HEARING
Tuesday, July 15, 2025 — 9:30 a.m.

Public Meeting Room A
Delta Charter Township Building, 7710 W. Saginaw Highway,
Lansing, MI 48917

The Department of State will hold a public hearing to receive public comments on proposed changes to the Use of Electronic Pollbook rule set.

The proposed rules would provide that an electronic pollbook must have a secure live connection to the Qualified Voter File while voting is taking place, if the site has internet access. Further, the proposed rules would provide that the electronic pollbook software download provided in MCL 168.668b must still take place and serve as a backup to the live connection.

By authority conferred on the secretary of state by Section 31 of the Michigan Election Law, 1954 PA 116, MCL 168.31.

The proposed rules will take effect immediately after filing with the secretary of state. The proposed rules are published on the State of Michigan's website at Michigan.gov/ARD and in the July 1, 2025, issue of the Michigan Register. Copies of these proposed rules may also be obtained by mail at the address below or by electronic mail at the following email address: Elections-PublicComment@Michigan.gov.

Comments on these proposed rules may be made at the hearing, by mail, or by electronic mail at the following addresses until 5 p.m. on July 15, 2025.

Bureau of Elections
P.O. Box 20126, Lansing, MI 48901-0726
Elections-PublicComment@Michigan.gov

The public hearing will be conducted in compliance with the 1990 Americans with Disabilities Act. If the hearing is held at a physical location, the building will be accessible with handicap parking available. Anyone needing assistance to take part in the hearing due to disability may call 800-292-5973 to make arrangements.

## COMMUNITY CALENDAR

### Sunday, June 15

**Alcoholics Anonymous:** 7:30 a.m., 9:30 a.m. and 4 p.m. at Tri-Cities Alano Club, 419 Fulton St., Grand Haven.

**Feast of the Strawberry Moon:** 9 a.m. to 4 p.m., Harbor Island.

**AA Speaker Meeting:** 7 p.m. at Tri-Cities Alano Club, 419 Fulton St., Grand Haven. Open to the public.

### Monday, June 16

**Alcoholics Anonymous:** 7:30 a.m., noon, 4 p.m. and 6 p.m. at Tri-Cities Alano Club, 419 Fulton St., Grand Haven.

**Family Planning Clinic:** 8 a.m. to 5 p.m. at Ottawa Department of Public Health, 1207 S. Beechtree St., Suite B, Grand Haven. By appointment only.

**SMART Recovery:** 12:30 p.m. at The Momentum Center, 401 N. Seventh St., Grand Haven.

**Alzheimer's and Dementia Caregiver Group:** 1-2:30 p.m. at United Methodist Church of the Dunes, 717 Sheldon Road.

**Chair Yoga:** 5:30 p.m. at United Methodist Church of the Dunes, 717 Sheldon Road, Grand Haven. Fee is $1 per class.

**Support Group for Loss of Loved One Due to Addiction:** 6-7:30 p.m. at The Momentum Center, 401 N. Seventh St., Grand Haven.

**Alcoholics Anonymous:** 7 p.m. at First Presbyterian Church, 508 Franklin Ave., Grand Haven.

**Al-Anon:** 7 p.m. at St. John's Episcopal Church, 524 Washington Ave., Grand Haven.



"Sytsema has cared for our family for years.
My Husband and I have already pre-arranged and John was extremely helpful and caring. I highly recommend Sytsema as they go above and beyond for every client, every time."
DIANE W.

SYTSEMA FUNERAL & CREMATION SERVICES
(616) 842-6100 | (231) 726-5210 | sytsemafh.com
Muskegon | Norton Shores | Spring Lake | Grand Haven | Roosevelt Park | Ravenna

Media Placement one
Powered by the Michigan Press Association

# AFFIDAVIT OF PUBLICATION

1642 Yosemite Dr., Lansing, MI 48917
517.372.2424 solutions@mediaplacementone.com

MPAS MICHIGAN PRESS ASSOCIATION SERVICES

Advertiser: Michigan Dept of State

Date of order: June 10, 2025

This is to certify that the Public Notice scheduled to run in the newspaper listed ran as the placement details below and proof of publication is attached.

Newspaper Name: **Grand Haven Tribune**

| Run Date | Ad Size | Caption/Position/Special Instructions |
|---|---|---|
| 6/14/2025 | 1/4 Page | Public Notice |

Signed by ________________________ (MP1/MANSI Representative)

June 14, 2025

Notary Public:

Signed by ________________________ (Notary Public)

June 14, 2025

**JAMES R. TARRANT**
**NOTARY PUBLIC – STATE OF MICHIGAN**
**COUNTY OF VAN BUREN**
My commission expires April 12, 2029
Acting in the County of Ingham

# Stonewall

Continued from Page 1A




A placard placed by police on the doors of the Stonewall Inn in New York City's Greenwich Village after their raid in June 1969 is now part of the national historic monument that honors the struggle for LGBTQ+ rights.
DREW ANGERER/ GETTY IMAGES FILE

They fought back, with the fists and fury of a people tired of being targeted and condemned for who they are.

The Stonewall riots represent such a significant chapter in American history that President Barack Obama designated the bar's exterior, an adjacent park and the surrounding streets a national monument in 2016 so that what happened there, and the people involved, would never be forgotten.

Less than a decade later, President Donald Trump wants Americans to remember only part of the story. In February, the National Park Service stripped references to transgender people from the monument's website. The move was part of Trump's broader campaign to recognize the existence of just two sexes – male and female – and combat what he calls "gender ideology."

Trans people who battled police alongside gay men and lesbians at Stonewall have now been erased from the government's official history of that event.

"That's just wrong," said Miss Major Griffin-Gracy, who participated in the riots and now lives in Little Rock, Arkansas. Miss Major, as she is known, is a transgender activist who has argued for years that trans Americans' involvement in Stonewall has never been fully acknowledged.

Mark Segal, a gay rights activist from Philadelphia who was inside Stonewall the night of the raid, is appalled by Trump's attempt at trans-washing LGBTQ+ history.

"I am a witness to history, and my trans brothers and sisters were with me that night," Segal said. "I won't allow him to censor history. I want people to realize that when a government tries to erase a group of people, that's dangerous."

**'Go get 'em, girls!'**

Segal was at the back of the bar, near the dance floor, where other young people hung out, when police came barreling through. It was 1:20 a.m., a Saturday.

Segal, then 18, had been in New York for just six weeks. Growing up in Philadelphia, he had felt as if he were the only gay man in the world. Gay men were practically invisible in 1969. He had heard that Greenwich Village was a place where people could be themselves, so he headed to New York and found his way to Christopher Street in the heart of the city's gay scene.

There, he found a circle of friends like himself. He found Stonewall.

Fredd "Tree" Sequoia had discovered Greenwich Village a few years earlier. He had heard about it from a friend. So one day, while he was a teenager, he sneaked off from his home in Brooklyn and boarded a train to the city. He was so taken by the neighborhood's thriving mixture of clubs, coffee shops and easy sex that he moved there and never left.

Stonewall opened in early 1967 and quickly became his main hangout. He was there, along with Segal and others, dancing at the back of the bar, when the police charged in.

What happened next is legend, one that has been repeated and embellished so often that it can be hard to separate fact from fiction.

About 200 people were inside the bar that morning. Some, like Sequoia, were dancing. Others were just standing around, talking to friends, openly flirting – something that could have gotten them arrested in an era where same-sex relations were considered deviant and criminal.



**Major Griffin-Gracy was at the Stonewall Inn in New York City on the early morning of June 28,1969, when patrons fought back against a police raid that would trigger the modern movement for LGBTQ+ rights.**
JACOB SLATON/SPECIAL TO USA TODAY

Suddenly, the lights in the bar blinked on and the music stopped. Sequoia heard a friend known as Gypsy scream at the top of his lungs, "Don't touch me!"

Then, pandemonium.

A dozen or so police officers moved swiftly through the bar. They justified the raid by saying they were investigating the illegal sale of alcohol. Until 1966, New York had barred the sale of booze to known or suspected homosexuals. Gay bars like Stonewall had tried to get around that rule by operating as private clubs, but with homosexuality a crime, they were still easy targets and often subjected to police raids and brutality.

Officers smashed bottles of liquor against the bar, shattered the jukebox and cigarette machine, and shoved people up against the wall.

"I was scared out of my mind," Segal said. "I had never seen such violence in my life."

Police demanded to see IDs. Most patrons, including Segal and Sequoia, were eventually allowed to leave. Trans people were isolated in a back room so police could examine them to verify their sex. Some refused to cooperate. Lesbians in the front of the bar recoiled at what they considered unnecessary frisking. One reportedly punched a cop.

Out on the street, rumors of the raid spread. A crowd gathered in front of the bar and watched as police officers yanked drag queens and trans people through the door, some kicking and screaming, and shoved them into the back of a waiting van.

"They were just rude," said Miss Major, who was in the crowd. "They put their hand where it didn't belong. They shoved them and pushed them around and then they didn't help us when we had to go up the steps to the paddy wagon."

Boyce and a friend, Robert "Birdie" Rivera, were on their way to Stonewall when the raid happened. They were dressed in "scare drag" – a looser gender-bending style that would later be popularized by the singer Boy George – instead of full drag, which could have gotten them thrown in jail. Police were known to arrest anyone who wasn't wearing at least three items of clothing that corresponded to their sex at birth.

All at once, Boyce, then 21, felt a surge of people behind him that seemed unusual, even for a weekend. He looked toward Stonewall and could see the police cars' red bubble lights, twirling and brightening up the night sky. The crowd was pushing toward the bar. Boyce and Rivera headed in that direction. By the time they got to Stonewall, the number of onlookers had grown and formed a semi-circle outside the bar's doors.

Boyce watched as an officer dragged the skinny queen in the rhinestone-studded pumps out the door. The bystanders giggled as she fought back and the officer struggled to get her into the police van. They laughed harder when she kicked him to the pavement with her sparkly footwear. He got up and bolted into the vehicle.

When the beating was over, he stepped back onto the sidewalk, jaws clenched, Boyce recalls, and barked a slur at the crowd. "You saw what you came to see. Now get out of here!"

Instead of scattering, the onlookers moved in his direction. Boyce could see the officer's anger rise as he commanded the crowd to disperse and ducked back inside the bar.

Exactly what turned the resistance into a riot remains an open debate. By some accounts, the tipping point was the lesbian punching the officer. Boyce suggests it was the officer's menacing response after he was kicked to the ground. Whatever the cause, the crowd's frustration gave way to fury.

"People started throwing things at the door, whether it be coins from their pockets or a stone they picked up, or an empty can of soda," Segal said.

Segal saw drag queens, loud and boisterous, hurl anything that wasn't fastened to the street. "Whoever assumes that a swishy queen can't fight

**See STONEWALL, Page 5A**




Department of State
Elections & Campaign Finance
Administrative Rules for Use of Electronic Pollbook
Rule Set 2025-14 ST

NOTICE OF PUBLIC HEARING
Tuesday, July 15, 2025 — 9:30 a.m.

Public Meeting Room A
Delta Charter Township Building, 7710 W. Saginaw Highway,
Lansing, MI 48917

The Department of State will hold a public hearing to receive public comments on proposed changes to the Use of Electronic Pollbook rule set.

The proposed rules would provide that an electronic pollbook must have a secure live connection to the Qualified Voter File while voting is taking place, if the site has internet access. Further, the proposed rules would provide that the electronic pollbook software download provided in MCL 168.668b must still take place and serve as a backup to the live connection.

By authority conferred on the secretary of state by Section 31 of the Michigan Election Law, 1954 PA 116, MCL 168.31.

The proposed rules will take effect immediately after filing with the secretary of state. The proposed rules are published on the State of Michigan's website at Michigan.gov/ARD and in the July 1, 2025, issue of the Michigan Register. Copies of these proposed rules may also be obtained by mail at the address below or by electronic mail at the following email address: Elections-PublicComment@Michigan.gov.

Comments on these proposed rules may be made at the hearing, by mail, or by electronic mail at the following addresses until 5 p.m. on July 15, 2025.

Bureau of Elections
P.O. Box 20126, Lansing, MI 48901-0726
Elections-PublicComment@Michigan.gov

The public hearing will be conducted in compliance with the 1990 Americans with Disabilities Act. If the hearing is held at a physical location, the building will be accessible with handicap parking available. Anyone needing assistance to take part in the hearing due to disability may call 800-292-5973 to make arrangements.

# AFFIDAVIT OF PUBLICATION

Media Placement one
Powered by the Michigan Press Association

1642 Yosemite Dr., Lansing, MI 48917
517.372.2424 solutions@mediaplacementone.com

MPAS
MICHIGAN PRESS ASSOCIATION SERVICES

Advertiser: Michigan Dept of State

Date of order: June 10, 2025

This is to certify that the Public Notice scheduled to run in the newspaper listed ran as the placement details below and proof of publication is attached.

Newspaper Name: **Adrian Daily Telegram**

| Run Date | Ad Size | Caption/Position/Special Instructions |
|---|---|---|
| 6/15/2025 | 1/4 Page | Public Notice |

Signed by ______________________ (MP1/MANSI Representative)

June 15, 2025

Notary Public:

Signed by ______________________ (Notary Public)

June 15, 2025

**JAMES R. TARRANT**
**NOTARY PUBLIC – STATE OF MICHIGAN**
**COUNTY OF VAN BUREN**
My commission expires April 12, 2029
Acting in the County of Ingham